UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| KATHLEEN EISWALD, | Case No. 18-cv-03714-LB |
| Plaintiff, | |
| v. | **ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** |
| NANCY A. BERRYHILL, | |
| Defendant. | Re: ECF No. 17 & 24 |

## INTRODUCTION

The plaintiff Kathleen Eiswald seeks judicial review of a final decision by the Commissioner of the Social Security Administration denying her claim for Title XVI Supplemental Security Income ("SSI").[1] The plaintiff moved for summary judgment, and the Commissioner opposed the motion and filed a cross-motion for summary judgment.[2] All parties consented to magistrate-judge jurisdiction.[3] Under Civil Local Rule 16–5, the matter is submitted for decision by this court without oral argument. The court grants the plaintiff's motion for summary judgement.

---

[1] Mot. – ECF No. 17 at 3. Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] *Id.*; Cross-Mot. – ECF No. 24.

[3] Consent Forms – ECF Nos. 9, 10.

**STATEMENT**

## 1. Procedural History

On February 5, 2014, the plaintiff, then aged 48, filed an application for SSI based on disability under Title XVI of the Social Security Act ("SSA").[4] The SSA denied the plaintiff's claim on September 30, 2015, and again on reconsideration on April 27, 2016.[5] She filed a written request for a hearing on May 21, 2015.[6] She appeared and testified at a hearing held on February 1, 2017.[7]

Administrative Law Judge Kevin Gill ("the ALJ") issued an unfavorable decision on May 17, 2017.[8] The plaintiff requested review by the Appeals Council, and the Appeals Council denied the request on May 24, 2018.[9] The plaintiff filed this action for judicial review on June 21, 2018 and moved for summary judgment.[10] The Commissioner filed a cross-motion for summary judgment and opposed the plaintiff's motion.[11]

## 2. Summary of Administrative Record

### 2.1 Medical Records

#### 2.1.1 Richard Godfrey, M.D. — Treating

Dr. Godfrey specializes in surgical oncology and treated the plaintiff for two and a half years after her diagnosis of breast cancer in 2012.[12] On June 15, 2014, Dr. Godfrey completed a

---

[4] AR 211–231. Administrative Record ("AR") citations refer to the page number in the bottom right hand corner of the Administrative Record.

[5] AR 151–156; 161–165.

[6] AR 167–169.

[7] AR 36.

[8] AR 16–30.

[9] AR 207.

[10] Compl. – ECF No. 1; Mot. – ECF No. 17.

[11] Cross-Mot. – ECF No. 24; Reply – ECF No. 25.

[12] AR 431, 450, 453.

residual-functional-capacity evaluation form.[13] The plaintiff's symptoms included "intermittent left shoulder and breast pain, continuous left hand and wrist joint pains, [and] frequent mood swings."[14] He listed the following diagnoses: "stage two breast cancer (treated), basal metacarpal joint arthritis, [and] bipolar condition."[15] Dr. Godfrey treated this conditions with "splinting, anti-inflammatory medications, [and] psychological therapy."[16] The plaintiff's prognosis was "guarded."[17]

The plaintiff's impairment lasted, or was expected to last, at least twelve months.[18] The patient could not stand for at least six of eight hours because of mental fatigue (she could stand continuously for four hours).[19] She could continuously sit upright for at least six of eight hours.[20] The plaintiff needed to lie down during the day because of mental fatigue.[21] She could walk "more than four" city blocks without stopping.[22]

The plaintiff could constantly reach above her shoulder, at waist level, and below waist level.[23] She could rarely perform handling and fingering.[24] She could frequently lift five to ten pounds over an eight-hour period, and could frequently carry 11 to 20 pounds.[25] She had problems "grasping, pulling, pushing, or doing fine manipulations" with her hands because she had basal

---

[13] AR 450–453. There are no medical records in the administrative record from Dr. Godfrey other than the residual-functional-capacity evaluation form.

[14] AR 450.

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] AR 451.

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.* On the form, "rarely" was defined as 0–33% of the time, "frequently" was defined as 34–67% of the time, and "constantly" was defined as 68–100% of the time.

[25] AR 452.

metacarpal joint arthritis.[26] She did not have problems bending, squatting, kneeling, or turning any part of her body.[27] She could travel alone.[28] The plaintiff's pain was "6/10 with repetitive motion."[29]

Dr. Godfrey stated that the plaintiff was not capable of returning to her past job because her "primary limitation[s] [were] bipolar condition and repetitive stress disorder."[30] The plaintiff could return to work in June of 2015 with "resolution of [her] joint pain and effective psychotherapy."[31]

### 2.1.2    Rose Lewis, M.D. — Examining

Dr. Lewis reviewed the plaintiff's disability-evaluation report and performed a comprehensive internal medicine evaluation on August 24, 2014.[32] The plaintiff had pain in her left wrist and could not pinch.[33] She could not "do buttons or zippers, but she [could] pick up and hold with her left hand if she [had] a wrist brace on."[34] The plaintiff took care of personal needs with some difficulty with her left hand.[35] She could not vacuum, mop, or sweep due to wrist pain.[36] She took care of her cat and used her computer with a left-hand splint for periods of no longer than ten minutes at a time to check her email or do minimal typing.[37] She took a two-hour daily walk.[38]

Dr. Lewis observed that the plaintiff was a "well-nourished female in no acute distress [who] was unable to pick up a paperclip off the table with her left hand, but ambulate[d] without an

---

[26] Id.

[27] Id.

[28] Id.

[29] Id.

[30] AR 453.

[31] Id.

[32] AR 460.

[33] Id.

[34] Id.

[35] Id.

[36] Id.

[37] Id.

[38] Id.

assistive device."[39] The plaintiff used a medically necessary left-wrist splint at all times.[40] Dr. Lewis found there was "tenderness to palpation on the left base of the thumb and it is a negative Tinel's."[41] The plaintiff's motor strength/muscle bulk and tone was described as "[p]resent and equal bilaterally in the upper and lower extremities and [was five out of five]."[42] Her grip strength was a five out of five on the right hand and three and a half out of five on the left.[43]

Dr. Lewis diagnosed the plaintiff with "[s]tatus post left breast cancer with three positive nodes and a lumpectomy, node dissection, chemotherapy and radiation [and] [l]eft De Quervain's syndrome of the wrist."[44] Dr. Lewis reported that the plaintiff had no limitations on standing, walking, or sitting.[45] The plaintiff could carry twenty pounds occasionally and ten pounds frequently due to the issues with her wrist and grip, could climb frequently, and had no other limitations to postural activities, could reach and feel with no limitations, and could handle and finger frequently.[46] Dr. Lewis recommended that workplace environmental activities involving heights and heavy machinery should be limited because of the plaintiff's "decreased grip, fine finger movement, the left wrist splint, and the De Quervain's of the left wrist with a decreased range of motion of the wrist."[47]

---

[39] AR 461.

[40] AR 462.

[41] AR 463.

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] AR 464.

### 2.1.3    University of California, San Francisco Medical Center — Treating

The plaintiff saw Ian Bledsoe, M.D., on several occasions at UCSF in 2016.[48] On September 2, 2016, she was experiencing leg stiffness.[49] Dr. Bledsoe noted the plaintiff's history of "domestic abuse and PTSD/anxiety, breast cancer and previous diagnosis of spasmodic dysphonia."[50] The plaintiff's first instance of movement-related symptoms was in 2001, when she was in an abusive relationship and there were deaths in her family.[51] After experiencing issues with her voice, she saw a neurologist in Argentina, who diagnosed her with spasmodic dysphonia.[52]

In 2015 the plaintiff's "leg became very tight and stiff."[53] "[H]er left thigh and calf felt tight and painful, her leg was extended at the knee, and she would sometimes have slight foot inversion."[54] While she did not fall or require an assistive device, her gait was affected.[55] Upon returning from New York, her symptoms resolved "very quickly" with the assistance of physical therapy.[56] In the two months prior to visiting UCSF, she experienced similar symptoms in her right foot.[57] She felt "pain and instability in her right ankle and toes, and mild tightness around her lateral right calf[,]" though the symptoms were not as severe as those in the summer of 2015.[58]

The symptoms noted by Dr. Bledsoe were as follows:

> Cognitive: She has noticed significant memory loss lately, both short term and long term, including forgetting conversations.

---

[48] AR 591, 595. The progress notes on September 2, 2016 were authored by Ethan Gus Brown, M.D. and co-signed by Dr. Bledsoe, who is the physician who examined the plaintiff.

[49] AR 591.

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] AR 591–592.

[57] AR 592.

[58] *Id.*

Behavioral: Significant anxiety, PTSD, but denies significant depressions. She is concerned about impulse control and getting more angry lately, but feels that at some times it is appropriate.

Autonomic: No lightheadedness, constipation, or changes in urinary frequency.

Sleep: Most of the time, though sometimes limited because of anxiety.

Speech/Swallow: Different voice since 2003; better swallowing.

Gait/Balance: No changes.[59]

Dr. Bledsoe found that the plaintiff's description of her symptoms was "most likely . . . related to a functional movement disorder, specifically functional dystonia."[60] His plan was for the plaintiff to undergo a brain MRI, have physical therapy, and schedule an appointment if her symptoms returned.[61] The plaintiff had the MRI in October 2016, and no issues were identified.[62]

On December 12, 2016, the plaintiff returned to UCSF after having lost power in her right leg.[63] Dr. Bledsoe noted that first the plaintiff's right ankle gave out, causing her to fall, and then she could not move her right leg at all later in the evening, which was followed by involuntary movements in her right arm and involuntary elevation of her right shoulder.[64] He also noted that the plaintiff was unable to get insurance coverage for physical therapy but found exercises learned in Taoist spiritual practice helpful.[65] Dr. Bledsoe found the plaintiff's condition to be "most consistent with a functional neurologic disorder with episodic weakness and dystonic movements[,]" and her episodic weakness was "temporally related to significant emotional stress."[66] He stated that the plaintiff would continue with her current strategy of Taoist spiritual practice and psychotherapy and return to the hospital as needed in the future.[67]

---

[59] *Id.*

[60] AR 594.

[61] *Id.*

[62] AR 595.

[63] *Id.*

[64] *Id.*

[65] *Id.*

[66] AR 597.

[67] *Id.*

## 2.2    Mental Health Records

### 2.2.1    Catherine Maggio, MFT ——Treating

Catherine Maggio is a licensed Marriage and Family Therapist who held regular weekly sessions with the plaintiff from November 2002 to December 2015.[68] In January 2015, Ms. Maggio submitted a letter as part of the plaintiff's SSI application.[69] She saw the plaintiff's ability to function deteriorate dramatically due to the presence of severe medical issues, which included "the recurrence of tumors in several parts of her body including her breast, lymph nodes, and adrenal glands; infections in her arm and her breast; and cystic growth on her ovaries."[70] She found that being a cancer patient affected the plaintiff's ability "in medical settings and in the rest of her life" and made it difficult for the plaintiff to maintain her job as a cleaner due to difficulty in scheduling appointments and arranging transportation.[71] Ms. Maggio noted that the plaintiff tried to perform cleaning jobs and continue film editing to earn money but was not successful.[72] The plaintiff's "experience of living as a cancer patient [was] that it '[was] a chronic condition that drives [the plaintiff] into bankruptcy, takes all [her] time, and interrupts everything else [she's] doing and expects [her] to drop it.'"[73] As a result of this stress, the plaintiff would shut down or not leave her house.[74] The plaintiff experienced drastic mood changes and periods of feeling very ill and other times better.[75] Her interactions with people were very inconsistent.[76] The plaintiff would be "highly sensitive and easily overreact[ ] or misinterpret[ ] others' comments or

---

[68] AR 585.

[69] AR 572. Ms. Maggio stated that she submitted another letter on May 20, 2014 that provided information about the plaintiff's condition. The court did not locate the letter in the administrative record.

[70] AR 572.

[71] *Id.*

[72] AR 573.

[73] *Id.*

[74] *Id.*

[75] *Id.*

[76] AR 573–574.

behavior."[77] Ms. Maggio believed that even before the current slate of issues, the plaintiff had an impaired ability to function in a social and work setting, and she concluded that the plaintiff's state at the time of the report rendered her "incapable of finding work, adequately performing work duties, or functioning in a normal capacity in her everyday life."[78]

In January 2016, Ms. Maggio completed a mental-impairment questionnaire.[79] Ms. Maggio treated the plaintiff with "psychotherapy to gain insight into emotional and behavioral patterns and increase functioning."[80] While the plaintiff's behavior and ability to function in social situations was better, she was "still very limited."[81] The plaintiff continued to experience issues related to inflammation and arthritis in her hands, shooting pains in her arms, and the cumulative effects of her cancer treatment, which involved radiation and chemotherapy.[82]

The plaintiff exhibited the following symptoms related to her mental-health status: blunt, flat or inappropriate affect; impairment in impulse control; generalized persistent anxiety; somatization unexplained by organic disturbance; mood disturbance; difficulty thinking or concentrating; recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress; pathological disturbances of mood or affect; persistent nonorganic disturbance of vision, speech, hearing, use of a limb, movement and its control, or sensation; apprehensive expectation; paranoid thinking or inappropriate suspiciousness; recurrent obsessions or compulsions, which are a source of marked distress; substance dependence; emotional withdrawal or isolation; intense and unstable interpersonal relationships and impulsive and damaging behavior; hyperactivity; motor tension; deeply ingrained, maladaptive patterns of behavior; vigilance and scanning; autonomic hyperactivity; and persistent irrational fear of a specific object,

---

[77] AR 574.

[78] *Id.*

[79] AR 585–90.

[80] AR 585.

[81] *Id.*

[82] *Id.*

activity, or situation which results in a compelling desire to avoid the dreaded object, activity or situation.[83]

   Ms. Maggio addressed the plaintiff's mental abilities and aptitudes needed to do unskilled work.[84] The plaintiff had an "unlimited or very good" ability to understand and remember very short and simple instructions, sustain an ordinary routine without special supervision, make simple work-related decisions, and be aware of normal hazards and take appropriate precautions.[85] She had a "limited but satisfactory" ability to remember work-like procedures, carry out very short and simple instructions, ask simple questions or request assistance, and respond appropriately to changes in a routine work setting.[86] She had a "seriously limited, but not precluded" ability to maintain attention for two-hour segments.[87] She was "unable to meet competitive standards" to maintain regular attendance and be punctual within customary, usually strict tolerances, and accept instructions and respond appropriately to criticism from supervisors.[88] She had "no useful ability to function" in terms of being able to work in coordination with or proximity to others without being unduly distracted, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, and deal with normal work stress.[89]

---

[83] AR 586–587.

[84] AR 587. The form defined the ratings this way: "Seriously limited but not precluded means ability to function in this area is seriously limited and less than satisfactory, but not precluded in all circumstances. Unable to meet competitive standards means your patient cannot satisfactorily perform this activity independently, appropriately, effectively, and on a sustained basis in a regular work setting. No useful ability to function, an extreme limitation, means your patient cannot perform this activity in a regular work setting." *Id.* "Unlimited or very good" and "limited but satisfactory" were not specifically defined.

[85] *Id.*

[86] *Id.*

[87] *Id.*

[88] *Id.*

[89] *Id.*

On the plaintiff's "mental abilities and aptitudes needed to do semiskilled and skilled work", Ms. Maggio marked that the plaintiff had an "unlimited or very good" ability to understand and remember detailed instructions, a "limited but satisfactory" ability to carry out detailed instructions and set realistic goals or make plans independently of others, and "no useful ability to function" when dealing with the stress of semiskilled and skilled work.[90] On the plaintiff's "mental abilities and aptitude needed to do particular types of jobs," Ms. Maggio marked the plaintiff as having an "unlimited or very good" ability to adhere to basic standards of neatness and cleanliness, and travel in an unfamiliar place; a "limited but satisfactory" ability to use public transportation; no ability "to meet competitive standards" to interact appropriately with the general public; and "no useful ability to function" to maintain socially appropriate behavior.[91]

Ms. Maggio found no reduced intellectual functioning based on her interactions with the plaintiff over thirteen years, but stated that the plaintiff's psychiatric condition exacerbated her experience of pain or other physical symptoms.[92] The plaintiff experienced "one or two" episodes of decompensation within a twelve-month period, each of at least two-weeks duration; plaintiff has a "marked" difficulty in maintaining concentration, persistence or pace; and she has "extreme" difficulties in maintaining social functioning and restrictions of activities of daily living.[93]

The plaintiff's impairments or treatment would cause her to miss more than four days of work per month, and that these impairments lasted or could be expected to last at least twelve months.[94] The plaintiff's impairments were reasonably consistent with the symptoms and functional limitations described above, and no alcohol or substance abuse contributed to the plaintiff's limitations.[95] The plaintiff experienced the symptoms and limitations described in the

---

[90] AR 588.

[91] *Id.*

[92] *Id.*

[93] AR 589.

[94] AR 590.

[95] *Id.*

questionnaire since 1998, and had a significant increase in symptoms due to her cancer treatment in 2012.[96]

### 2.2.2    Lisa Kalich, Psy.D. — Examining

On August 21, 2014, Dr. Kalich evaluated the plaintiff to provide an assessment regarding her eligibility for social-security benefits.[97] She was referred by the plaintiff's Benefits and Entitlement Specialist, Noah Glasser, to assess the plaintiff's activities of daily living, social functioning, concentration, persistence, and pace, and episodes of decompensation.[98]

Dr. Kalich's report stated that the plaintiff had a traumatic childhood involving physical and emotional abuse and an attempted sexual assault.[99] The plaintiff was married from 1991 to 2003 or 2004 and endured physical and sexual abuse throughout the marriage causing her mental health to deteriorate.[100] She had lived with a friend since 2006, but the relationship was "tumultuous" due to her irritability and anger episodes.[101] She had trouble outside of the home for similar reasons.[102] The plaintiff's daily routine consisted of waking up early, exercising, preparing food, completing household chores, attending appointments, running errands, and working on film projects.[103] She worked as a housekeeper twice a week.[104] She was able to drive and occasionally used her roommate's vehicle. Otherwise she walked or bicycled to her destination.[105]

The plaintiff graduated high school and attended college intermittently.[106] For most of the plaintiff's adult life, she was employed as a housekeeper with many of her clients being long

---

[96] AR 590.

[97] AR 454.

[98] *Id.*

[99] *Id.*

[100] AR 454–455.

[101] AR 455.

[102] *Id.*

[103] *Id.*

[104] *Id.*

[105] *Id.*

[106] *Id.*

term.[107] At the time of Dr. Kalich's evaluation, the plaintiff had three clients; two required weekly visits.[108] Throughout her career, she was fired several times and in the year before the evaluation she was fired for cursing at a client after the client took a vacation without providing the plaintiff with notice.[109] The plaintiff reported enduring emotional and sexual abuse by clients.[110] The plaintiff worked as a filmmaker as a hobby, but she was not able to make money doing so.[111]

According to the report, the plaintiff's medical history involved a diagnosis in 2002 of Stage 2 and 3 lymphoma, for which she received (1) chemotherapy and radiation, (2) a hysterectomy in 2009 because of severe endometriosis which caused hair loss, pica, and blood-pressure disruptions, (3) hormone replacement therapy following the hysterectomy, and (4) a breast-cancer diagnosis.[112] There was no finding that she abused any substance, though she occasionally used a small amount of marijuana.[113]

The plaintiff's mental-health history involved a diagnosis of PTSD related to the violence she experienced during her marriage that caused extreme reactions to triggers in the environment.[114] One example provided involved the plaintiff's losing consciousness during a violent movie.[115] Dr. Kalich noted that the plaintiff experienced symptoms of depression, suicidal thoughts, self-harming behavior, and a history of anorexia.[116] During the evaluation, the plaintiff "exhibited signs of mania/hypomania, including rapid, tangential speech, psychomotor agitation, a flight of ideas, [ ] grandiosity[,]" and she made statements "indicative of a subtle paranoia."[117] Dr. Kalich

---

[107] *Id.*

[108] *Id.*

[109] *Id.*

[110] *Id.*

[111] *Id.*

[112] *Id.*

[113] AR 456.

[114] *Id.*

[115] *Id.*

[116] *Id.*

[117] AR 456.

United States District Court
Northern District of California

reported that the plaintiff had participated in individual therapy with Catherine Maggio since 2002, and that this therapy was "instrumental in helping her [ ] overcome her posttraumatic anxiety."[118] The plaintiff was prescribed psychotropic medication early on in her treatment but stopped taking the medication due to negative side effects.[119]

Dr. Kalich reported several observations during the evaluation. The plaintiff was aware of date, time, and place and denied memory problems, and her intelligence appeared to be within the average to high average range.[120] She appeared restless and fidgety during the appointment, spoke at a rapid pace, was tangential, and rarely gave direct answers.[121] The plaintiff's affect was described as labile and ranged from tearful and upset to angry and outspoken.[122] She denied having auditory or visual hallucinations.[123] A Trauma Symptom Inventory – Second Edition (TSI-2) Test was administered.[124] The test showed elevated levels of the externalization, anger, and tension-reduction behaviors scales.[125] Externalization elevations are common in people prone to "exhibit problematic, self-destructive or aggressive behaviors as a way to deal with overwhelming internal states and/or underdeveloped abilities to regulate their emotions."[126] Anger elevations are common in people who "describe anger as an intrusive and unwanted experience and may perceive their anger as being outside of their control[,]" and tension-reduction elevations suggest that the plaintiff "may engage in external activity to modulate, interrupt, avoid or soothe negative

---

[118] *Id.*

[119] *Id.*

[120] AR 457.

[121] *Id.*

[122] *Id.*

[123] *Id.*

[124] *Id.* This test "assesses a wide range of complex symptomatology, including posttraumatic stress, dissociation, somatization, impaired self-capacities, and dysfunctional behaviors. It consists of two validity scales, 12 clinical scales and subscales, and four factors." *Id.*

[125] AR 457–58.

[126] AR 457.

United States District Court
Northern District of California

internal states."[127] Scales more typically associated with post-traumatic stress were not significantly elevated.[128]

Dr. Kalich also administered a Beck Depression Inventory – Second Edition (BDI-II) test, which is used to measure the severity of depression in adults and adolescents.[129] According to the test, the plaintiff was suffering from moderate to severe depression with a total score of thirty-one.[130]

Dr. Kalich's diagnostic impression was that there was enough evidence to support a diagnosis of Unspecified Bipolar and Related Disorder, though there was not enough evidence to determine whether she had Bipolar I or II Disorder.[131] There was insufficient evidence at the time to indicate the presence of PTSD.[132] In assessing work-related activities, he determined that the plaintiff likely experienced mild to moderate impairment to her daily living activities, marked impairment to social functioning (which "would create significant instability in the workplace and are likely to impede her ability to form and maintain positive work relationships"), and marked difficulty with regard to concentration.[133] The plaintiff was also vulnerable to future episodes of decompensation, and if she continued "to experience health problems or other stressors, her functioning will likely deteriorate further."[134]

### 2.2.3 Sokley Khoi, Ph.D. — Examining

Dr. Khoi provided a post-hearing clinical evaluation of the plaintiff on March 1, 2017.[135] She administered a pre-test interview/history/mental status exam, a Wechsler Adult Intelligence Scare-

---

[127] AR 458.

[128] *Id.*

[129] *Id.* "The BDI-II test was developed for the assessment of symptoms which corresponds to the DSM-IV. Test scores range from 0 to 63, with higher scores indicating more severe depression." *Id.*

[130] *Id.*

[131] *Id.*

[132] *Id.*

[133] AR 459.

[134] *Id.*

[135] AR 598.

IV (WAIS-4) Test, a Wechsler Memory Scale-IV (WMS-4): Flexible Approach Test, and a Trail Making Test Part A & B (TMT).[136] Dr. Khoi derived the information in her report from the plaintiff and documents she reviewed.[137] She reported that the plaintiff was difficult to interview due to being significantly tangential and difficult to redirect, but said that she was a fair historian.[138]

Dr. Khoi noted the following information from the interview under the plaintiff's relevant history: she completed high school and attended some college; she was self-employed as a housecleaner from 1997 to 2012, but stopped working due to breast cancer; the plaintiff gained income through the GA; she received psychotherapy from 2002 to 2015 but discontinued therapy for unknown reasons; she had no history of psychiatric hospitalization and had never been prescribed psychotropic medications; in addition to the breast cancer, her medical history included carpal-tunnel syndrome, a tumor in her uterus that was removed in 2009, liver problems, and multiple head injuries inflicted as a result of the domestic violence during her marriage; she took various herbal remedies; she used cannabis in the past for anxiety and pain; and she was arrested in the past for environmental activism.[139]

The plaintiff informed Dr. Khoi that she could perform all activities of daily living, but with restrictions due to her physical health problems.[140] She managed her finances, read, listened to music, took walks, socialized with friends, attended doctors' appointments, and used the computer.[141]

During the mental-health exam, the doctor reported that the plaintiff was cooperative and was oriented to person, place, and time.[142] She recalled three of three words during memory/short

---

[136] Id.

[137] Id.

[138] Id.

[139] AR 598–99.

[140] AR 599.

[141] Id.

[142] Id.

delay recall tests and correctly completed serial sevens.[143] Her speech was pressured and she was significantly tangential, but she was able to follow a simple three-step command.[144] Her affect was expansive and her mood was anxious.[145] She denied suicidal or homicidal ideation and auditory or visual hallucinations.[146] Dr. Khoi reported that the claimant's thought processes appeared very tangential and difficult to redirect.[147]

On the WAIS-IV Test to evaluate cognitive functioning, the plaintiff scored a "superior" on the Verbal Comprehensive Index section, a "high average" on the Perceptual Reasoning Index, a "superior" on the Working Memory Index, an "average" on the Processing Speed Index, and a "high average" for the Full Scale IQ score.[148] It was reported that there was "significant variability among the subtests with scores ranging from the average to the superior range."[149] On the WMS-IV test, she was within the borderline range on the Auditory Memory Index, the average range on the Visual Memory Index, the low-average range for the Immediate Memory Index, and the low-average range for the Delayed Memory Index.[150] The plaintiff's performance was within normal limits on Part A and B of the TMT.[151]

Dr. Khoi determined the plaintiff's work-related abilities were as follows: no impairment in her ability to follow/remember simple instructions; mild impairment in her ability to follow/remember complex or detailed instructions; no impairment in her ability to maintain adequate pace or persistence to perform one or two-step simple repetitive tasks; mild impairment in her ability to maintain adequate pace or persistence to perform complex tasks; mild to moderate

---

[143] *Id.*

[144] *Id.*

[145] *Id.*

[146] *Id.*

[147] *Id.*

[148] AR 599–600.

[149] AR 600.

[150] AR 600–601.

[151] AR 601.

impairment in her ability to adapt to changes in job routine; moderate ability to withstand the stress of a routine work day; and moderate impairment in her ability to interact appropriately with co-workers, supervisors, and the public on a regular basis.[152] Dr. Khoi wrote that "[a]n additional obstacle to adequate work performance may be the claimant's medical condition [but] [t]his matter is beyond the scope of today's evaluation and is deferred to medical opinion."[153] Lastly, Dr. Khoi found the plaintiff able to manage her own funds.[154]

### 2.3    Disability Determination Explanation — Initial

The plaintiff's first Disability Determination Explanation from examiner K. Horel was dated September 24, 2014, and she was determined to be not disabled.[155] The medical/psychological consultants were Anna M. Franco, Psy.D., and I. Herman, M.D.[156] After outlining the plaintiff's medical and psychological history, the report stated that it appears she would be capable of working by February 2015, that it was "[o]f interest that MFT really did not provide a [diagnosis] but presentation is suggestive of PTSD yet one time [evaluation] suggest no PTSD; both YTSs refer to pain issues and MD notes that [claimant], [with] resolution of joint pain and effective therapy will be capable of work by 6/15."[157] The report found that the plaintiff had at least one medically determinable impairment.[158] These included "non-severe" breast cancer, "severe" affective disorders; "severe" anxiety disorders; and "severe" other unspecified arthropathies.[159]

Under the 'A' criteria of the listings for the Psychiatric Review Technique (PRT) assessment, the report stated that a "medically determinable impairment [was] present that does not precisely satisfy the diagnostic criteria" and that "[p]aragraph 'A' criteria evidence the anxiety-related

---

[152] Id.

[153] Id.

[154] Id.

[155] AR 104.

[156] AR 91, 104.

[157] AR 95.

[158] Id.

[159] Id.

disorder – anxiety as the predominant disturbance or anxiety experienced in the attempt to master symptoms, as evidenced by. . . [r]ecurrent and intrusive recollections of a traumatic experience, which are a source of marked distress."[160] The 'B' Criteria section stated that the two disorders result in a mild restriction of daily living activities, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation, each of extended duration.[161] The following section stated that the "[e]vidence does not establish the presence of the 'C' criteria."[162]

The report found that one or more of the plaintiff's medically determinable impairments could be reasonably expected to produce her pain or other symptoms but that the plaintiff's statements about the intensity, persistence, and functionally limiting effects of the symptoms could not be substantiated by the objective medical evidence alone.[163] The plaintiff's daily living activities, precipitating and aggravating factors, and medication treatment were stated to be the most informative in assessing the credibility of the plaintiff's statements.[164] The plaintiff was found to be "[p]artially [c]redible" because she had limited use of her left wrist and possible bi-polar disorder, but she was able to take care of her personal needs, walked two hours a day, watched TV, used the internet, and worked as a part time housekeeper and videographer.[165] The report indicated that Dr. Godfrey was labelled a treating physician and Catherine Maggio, Lisa Kalich, and Rose Lewis were labelled non-treating or non-examining sources.[166] The reports from Dr. Godfrey, Ms. Maggio, and Dr. Kalich were assigned a weight of "other," while Dr. Lewis's report was given "great weight."[167]

---

[160] AR 95–96.

[161] AR 96.

[162] *Id.*

[163] AR 97.

[164] *Id.*

[165] *Id.*

[166] *Id.*

[167] *Id.*

The Physical Residual Functional Capacity Assessment section stated that plaintiff had exertional limitations.[168] She could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty pounds, stand or walk with normal breaks for six hours in an eight-hour work day, sit with normal breaks for more than six hours on a sustained basis in an eight-hour work day, and push or pull (including operation of hand and/or foot controls) with no other limitation.[169] This conclusion was based on the plaintiff's wrist problems.[170] The plaintiff's manipulative limitations were unlimited with regards to reaching in any direction, limited when handling with her left hand, limited when fingering with her left hand, and unlimited in feeling.[171] The report found no visual, communicative, or environmental limitations.[172]

The Mental Residual Functional Capacity Assessment conducted was for the period between February 2014 and February 2015.[173] It found that the plaintiff had understanding and memory limitations.[174] She was found to be not significantly limited in her ability to remember locations and work-like procedures and her ability to understand and remember detailed instructions, but she was moderately limited in her ability to understand and remember detailed instructions.[175]

Regarding persistence and concentration limitations, she was found to be not significantly limited in her ability to carry out very short and simple instructions, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerance, sustain an ordinary routine without special supervision, and make simple work related decisions.[176] She was found to be moderately limited in her ability to carry out detailed instructions, maintain attention and

---

[168] AR 98.

[169] Id.

[170] Id.

[171] AR 98–99.

[172] AR 99.

[173] Id.

[174] Id.

[175] Id.

[176] AR 100.

concentration for extended periods, work in coordination with or in proximity to others without being distracted by them, and complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.[177]

The plaintiff was not significantly limited in her abilities to ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others.[178] She was moderately limited in her abilities to interact appropriately with the general public, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in work setting.[179]

The examiner addressed source opinions that were more restrictive than his. He stated that Dr. Lewis's and Dr. Kalich's "opinion [was] an underestimate of the severity of the individual's restrictions/limitations and based only on a snapshot of the individual's functioning."[180] He stated that Ms. Maggio's opinion was an issue reserved for the Commissioner.[181] About Dr. Godfrey, he stated that the "opinion appears to rely on the assessment of limitations resulting from an impairment for which the source has not treated or examined the individual. The opinion is without substantial support from other evidence of record, which renders it less persuasive."[182]

The examiner's assessment of the plaintiff's vocational factors indicated that she was not able to perform her past relevant work as a house cleaner due to her inability to engage in constant

---

[177] Id.

[178] AR 100–101.

[179] Id.

[180] AR 101.

[181] AR 102–103.

[182] AR 102.

United States District Court
Northern District of California

handling.[183] She was thus deemed to be "limited to Medium work with occasional handling and fingering with her [left] hand. In addition, [she] is limited to Unskilled work with limited public contact by 02/2015."[184]

### 2.4 Disability Determination Explanation — Reconsideration

S. Cifriano submitted a reconsideration DDE on April 24, 2015 and concluded that the plaintiff was not disabled.[185] Jay Flocks, M.D., completed the medical portion of the DDE.[186] This section will focus on the differences between the initial DDE and this one.

The primary reconsideration issue was the plaintiff stated that she had again been diagnosed with breast cancer and masses on her ovaries.[187] The approximate date of the new condition was September 2014.[188] Her new medical issues caused extreme stress and caused her mental-health symptoms to increase in severity.[189] The plaintiff had not worked since last completing a disability report but had worked after the alleged onset date.[190]

Dr. Flocks provided additional comments in the Psychiatric Review Technique section. He wrote that "[a]n MFT is not an Acceptable Medical Source. However, the overall picture is suggestive to me of Depression, secondary to medical illness. This degree of possible malignancy is quite scary. I affirm the previous as written albeit some arcane dispute with the [diagnosis]."[191]

---

[183] AR 103.

[184] AR 104.

[185] AR 126.

[186] AR 123.

[187] AR 107.

[188] *Id.*

[189] *Id.*

[190] *Id.*

[191] AR 118. The previous entry that Dr. Flocks was affirming is as follows: "It appears that the claimant would be capable by 2/15. Of interest is that MFT really did not provide a [diagnosis] but presentation is suggestive of PTSD yet one time eval[uation] suggests no PTSD; both YSTs refer to pain issues and MD notes that claimant, [with] resolution of joint pain and effective therapy, will be capable of work by 6/15. Claimant has been in [therapy] since [potential onset date] of 2/14; LPSRTS are consistent with the 'autonomous/independent' work MFT refers to. Thus, LPSRTS as of 2/15 is reasonable." *Id.*

## 2.5    Function Report — Plaintiff

The plaintiff submitted a function report dated July 14, 2014 as part of her application.[192] In response to how her condition limits her ability to work, she wrote that she could no longer work as a house cleaner because her hands were "broken" to the point that she could no longer use a zipper or hold a cup of tea.[193] Her injuries were exacerbated by her anti-cancer drug causing rapid menopause.[194] She had frequent mood swings and a low tolerance for normal social environments and social norms.[195]

In describing her typical day, she wrote that she woke up early and followed the news.[196] She stated that she had constant numbness in her hands and could not open jars.[197] She used to be able to do the following activities that she can no longer do: write in her journal; use her computer mouse with her usual hand; open jars, use zippers, buttons, or snaps; use Ziploc bags or heavy dishes; bake or perform any other job requiring more than minimal use of her hands; or ride her bike, which was her primary mode of transportation.[198] She could adequately address her personal care but would at times engage in self-harm by cutting her nails until they bled and burned herself.[199] She was able to prepare easy meals for herself but "[could not] make 90% of what [she] used to make."[200] The plaintiff could not do most household chores.[201] She got around by walking,

---

[192] AR 294.

[193] *Id.*

[194] *Id.*

[195] *Id.*

[196] *Id.*

[197] AR 295.

[198] *Id.*

[199] AR 296.

[200] AR 297.

[201] *Id.*

borrowing her roommates car, or taking the bus.[202] She frequently walked, and while she had

difficulty shopping, she was able to do it.[203]

She described herself as an online activist and listed filmmaking as a hobby.[204] She had almost

completely stopped filmmaking due to chemotherapy, and was forced to support herself by

cleaning houses.[205] Most of her socializing was done online or by phone.[206] She said that she

experienced agoraphobia and severe anxiety because of her abusive ex-husband.[207] She found her

condition affected her ability to lift, reach, sit, remember things, complete tasks, concentrate,

follow instructions, use her hands, and get along with others.[208] She could walk for an hour

without a rest.[209]

The plaintiff said that she had problems with authority, had lost jobs due to not being able to

get along with people, and did not handle stress well.[210]

### 2.6    Function Report — Ralston Soong

Ralston Soong is the plaintiff's roommate and submitted a third-party function report to

support the plaintiff's application.[211] He had known the plaintiff for twenty-three years.[212] He

stated that she could use her hands well and needed help with basic chores.[213] Mr. Soong

described the plaintiff's typical day as taking care of her various health issues, walking, using the

---

[202] AR 298.

[203] *Id.*

[204] AR 299.

[205] *Id.*

[206] *Id.*

[207] *Id.*

[208] AR 300.

[209] AR 300–301.

[210] AR 301–302.

[211] AR 285.

[212] *Id.*

[213] *Id.*

internet, listening to the radio, reading, and keeping up with current events.[214] Before her illness, the plaintiff was able to ride her bike, clean, cook, and do heavy computer work.[215] He reported that the plaintiff's illness negatively impacted her ability to dress, bathe, care for her hair, feed herself, use the toilet, and use skin care products.[216] She needed reminders for appointments and to take medication.[217] She could prepare food, but since her illness began, he would help with shopping, preparing food, opening jars and Ziploc bags, and cooked when her hands hurt.[218] Mr. Soong did almost all cleaning chores.[219]

Mr. Soong said the plaintiff could be very excitable and seemed like she has PTSD.[220] She had become very direct with people.[221] She could walk for an hour before needing a short break, could pay attention for ten to fifteen minutes, and was able to follow instructions well.[222] He did not believe that she handled stress well, and she had outbursts due to her injuries.[223] Lastly, Mr. Soong stated he has known the plaintiff for a long time and said she was a very hardworking person "until the cancer and chemo treatments/radiation destroyed her body."[224] He felt that her personality had changed and said she now needed a lot of help.[225]

---

[214] AR 286.

[215] *Id.*

[216] *Id.*

[217] AR 287.

[218] *Id.*

[219] *Id.*

[220] AR 290.

[221] *Id.*

[222] *Id.*

[223] AR 291.

[224] AR 292.

[225] *Id.*

### 3. Administrative Proceedings

#### 3.1 Plaintiff's Testimony

At the February 1, 2016 hearing, the plaintiff was represented by an attorney.[226] The ALJ asked the plaintiff for basic information and then began questioning her about her work history.[227] The plaintiff testified that she was not currently working and last worked part-time in mid-2012.[228] She was a housecleaner for more than twenty years, working about twenty-five hours per week, "[b]ut over time, it was fewer and fewer hours [and] in the end, I couldn't do it because my wrists and hands were shot. They were just broken, not working."[229] When she could work as a house cleaner, each job took two hours, she would work one to three jobs per day, and she was paid twenty dollars per hour.[230]

The ALJ asked the plaintiff about her film work, and she testified that she tried to use that career path to get out of being a housecleaner.[231] She made several independent films, but the most she had ever made from this work was $1,800 as a videographer at a film festival in 2010.[232] She wanted to help younger women in the film industry.[233] Between 2013 and 2015, the plaintiff wrote, directed, edited, and operated cameras as part of her filmmaking.[234] Using the camera required her to wear large braces on her arms.[235]

As to what prevents her from working, the plaintiff testified that "[t]he most, at this point…has to do with my emotional susceptibility to being upset[.]"[236] When combined with her physical

---

[226] AR 38.

[227] AR 40-42.

[228] AR 42.

[229] *Id.*

[230] AR 43–44.

[231] AR 44.

[232] *Id.*

[233] *Id.*

[234] AR 45.

[235] *Id.*

[236] AR 46.

dystonia, she stated she "can fall into a state of stroke-like paralysis."[237] This can occur whether the triggering event is positive or negative, big or small, and leads to both "meltdowns" and periods of physical disability.[238] She described meltdowns as being akin to an unnatural adrenaline rush.[239] In response to the meltdowns, the plaintiff testified that she needs to "walk around a lot, get away from people, maybe even talk a lot to myself, and then really kind of shut down and be calm."[240] The plaintiff described feeling suicidal, hopeless, and worthless.[241]

The plaintiff testified that episodes of physical dystonia are frightening and said that they caused her body to "freeze up and spasm, or go into paralysis" similar to an "epileptic seizure, only it's a paralysis seizure."[242] During one episode she experienced (in the December before the hearing), "the whole side of [her] body was completely paralyzed."[243] The last episode occurred as a result of being invited to a film festival.[244] The plaintiff testified that her "entire leg froze up for about six months."[245] She describes this as not quite paralysis but "total tension, from ankle to hip [that] was very difficult to bear, because after a while, it starts grinding in your hipbone[.]"[246] To cope with these episodes, she "hit the bed, and immediately [went] to sleep" and experienced a lot of fatigue afterwards.[247] She was seeing Dr. Ian Bledsoe at UCSF and has found a regimen of qigong and therapy helpful.[248]

---

[237] AR 46–47.

[238] AR 47–48.

[239] AR 47.

[240] *Id.*

[241] AR 75–76.

[242] AR 48, 51.

[243] AR 48.

[244] AR 51.

[245] *Id.*

[246] AR 51–52.

[247] AR 48, 51.

[248] AR 49–50.

United States District Court
Northern District of California

Next, the ALJ asked the plaintiff to discuss her cancer and treatment.[249] The plaintiff described her endometriosis diagnosis, which led to having her uterus removed in 2009.[250] During the leadup to the surgery, her doctors warned her about the chemicals she had been working with as a housecleaner.[251] After the surgery, she spent six months healing from a methicillin-resistant staphylococcus aureus (MRSA) infection, and felt like she was getting better until experiencing weakness in her bones and losing weight.[252] This period of time was more debilitating than her experience with cancer.[253] While these issues predate the alleged onset date of January 2012, the plaintiff said that "it was like the uterus removal just made the cancer just start up like crazy."[254] The plaintiff also testified that the doctors informed her she had the cancer for two years before its discovery in January 2012.[255] She finished treatment around the end of March 2013.[256] Following the cancer, the plaintiff testified that she had sepsis, which was not resolved until the end of 2014.[257]

The plaintiff had surgery on both breasts and her ovaries removed.[258] She is currently taking Exemestane, which costed $500 per month.[259] She experienced bone pain as a side effect of the drug.[260] The pain is mostly in her feet and occurs when she walks or stands.[261] The plaintiff testified the pain fluctuates in degree where "sometimes [she] can take it, and sometimes [she is]

---

[249] AR 52.

[250] Id.

[251] Id.

[252] AR 53.

[253] AR 72–73.

[254] AR 53.

[255] Id.

[256] AR 73.

[257] AR 73–74.

[258] AR 54.

[259] Id.

[260] Id.

[261] AR 54–55.

afraid [her] toes are breaking."[262] She sometimes woke up in the middle of the night with pain in her forearms, and when she first began taking the drug, her hands hurt constantly.[263] She reported having lumps in her breast, but they did not require an operation.[264]

Next, the ALJ asked the plaintiff to describe a typical day.[265] She responded that her days can vary depending on her medical appointments but she typically makes food, plays with her cat, communicates with people online, attempts to network and "figure out what [she is] going to do next."[266] The plaintiff testified that while she wants to volunteer, she had not yet started.[267] She also outlined several ideas for what she may try to do for work.[268] Additionally, she testified that she has tried to look for work but "people haven't tried to give [her] a chance" because she has her "own way of doing the craziest things" and does not have a college education.[269]

The plaintiff's attorney then questioned her and first asked about her ability to gain or keep clients.[270] She testified that her clients were "more like friends" and "people who are supporting an artist" rather than being clients primarily interested in having their houses cleaned.[271] She stated they are "not looking for a person who's trying to find their voice, and has a lot of emotional problems."[272]

---

[262] AR 55.

[263] *Id.*

[264] AR 74.

[265] AR 55.

[266] AR 55–56.

[267] AR 56.

[268] AR 56–58.

[269] AR 74–75.

[270] AR 59.

[271] *Id.*

[272] *Id.*

On her limited physical abilities, the plaintiff testified that she loses power in her hands, her fingers are always numb, and her hands and wrists get numb very quickly after doing something.[273] She testified that she is unable to write or type a lot.[274]

Returning to the issue of physical dystonia, the plaintiff's attorney questioned how often the episodes occur.[275] The plaintiff testified that they do not occur regularly but are triggered by events such as the film festival.[276] She described having flashbacks where "emotions that are coming up in [her] are completely out of sync with the environment and the situation [she is] in."[277] The plaintiff testified that she has had therapy with Catherine Maggio for thirteen years and that it was helpful.[278] The plaintiff's attorney then asked her how often emotional responses come up during a work day.[279] The plaintiff responded that she was "trying to find out how to even cope with little encounters" and that if she experienced any verbal abuse she would not be able to hold it in.[280]

The ALJ asked about the biggest impediments to working various jobs.[281] The plaintiff said her biggest impediment to being a cashier would be "people," and she could not do a job where she put things in a box because of her hands.[282]

---

[273] AR 60.

[274] *Id.*

[275] AR 61.

[276] AR 61–62.

[277] AR 63.

[278] AR 64.

[279] *Id.*

[280] AR 65.

[281] AR 76.

[282] AR 76–77.

### 3.2    Testimony of Ralston Soong

Mr. Soong is the plaintiff's roommate.[283] He was examined by the plaintiff's attorney.[284] He had experienced the plaintiff's meltdowns, which she used to have "a few times a week."[285] "Sometimes it would be over a word or something I did, and she would take it maybe the wrong way, from my viewpoint, and she would just go off on a tangent, start shouting, et cetera. Sometimes, every now and then, she throws things."[286] Mr. Soong saw her get mad at other people.[287] It usually took several hours before she calmed down but it sometimes lasted a day or longer.[288] Mr. Soong testified he helped her in other ways because of her hand issues.[289] He will open any cans or jars, and sometimes finish cutting or cooking for her.[290] Lastly, Mr. Soong helped the plaintiff with the rent.[291]

The ALJ then questioned Mr. Soong.[292] He asked if there were any other issues that may affect her ability to function.[293] He testified she would become very angry if she was spoken to in a way that bothered her.[294] The ALJ asked about the plaintiff's cancer treatment.[295] Mr. Soong described the plaintiff as moody and depressed during that time and said small things would set her off.[296] Her energy level was low, and she was often at home laying down.[297] Mr. Soong stated the biggest

---

[283] AR 66.

[284] AR 67.

[285] Id.

[286] Id.

[287] AR 68.

[288] Id.

[289] Id.

[290] Id.

[291] AR 69.

[292] Id.

[293] Id.

[294] Id.

[295] Id.

[296] AR 70.

[297] Id.

United States District Court
Northern District of California

impediment to the plaintiff's holding a regular job is "the competitive nature of some of the job… the way people talk to each other. A little curt, a little short will set her off."[298]

### 3.3 Vocational Expert Testimony

Vocational expert Timothy Farrell testified at the hearing.[299] Mr. Farrell had read portions of the plaintiff's claim file and listened to her testimony.[300] He described the plaintiff's past work as a housecleaner to be "medium work, SVP-3 [specific vocational preparation]."[301] The ALJ then questioned Mr. Farrell by presenting hypothetical scenarios involving people with different sets of limitations.[302]

The ALJ's first hypothetical was a person of plaintiff's age, education, and work history who was "limited to lifting and carrying fifty pounds occasionally, twenty-five pounds frequently, sit, stand, walk six hours in an eight-hour day. The individual is limited to frequent handling on the left, and frequent fingering on the left. This individual can never climb ladders, ropes, and scaffolds. This individual is further limited to performing simple, routine tasks, limited to simple work-related decisions, and limited to interaction with the public only on a brief, [casual] basis, no more than 10% of the time."[303] Mr. Farrell testified that this person could not do the past job of house cleaner.[304] Job options for this person could be a "laundry worker…medium work, SVP-2, national numbers…24,000", a "cleaner, industrial…medium work, SVP-2…national numbers are 41,000", or a "cleaner/housekeeping… light work, SVP-2" with national numbers of 90,000 based on the 10% contact limitation.[305]

---

[298] AR 71.

[299] AR 77–78.

[300] AR 78.

[301] AR 79. Specific Vocational Preparation ("SVP") is defined "as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Cherwink v. Comm'r of Social Security*, No. 17-cv-00082-JSC, 2018 WL 1050194, at *4 (N.D. Cal. Feb. 26, 2018).

[302] AR 79.

[303] AR 79–80.

[304] AR 80.

[305] AR 80–81.

The second hypothetical posed was "the same person from Hypothetical #1, but this person is further limited to lifting and carrying 20 pounds occasionally, 10 pounds frequently. This individual is limited to only occasional interaction with co-workers, and this individual should avoid concentrated exposure to hazards, including heavy machinery, toxic chemicals, and open heat sources."[306] Mr. Farrell found this person able to be a "Final Inspector…light work, SVP-2, and the numbers on that are 17,000", or a lead former, which is a light work job, SVP-2 with national numbers of 11,000 when adjusted for hand use limitations.[307] Another job would be a marker which involves light work, SVP-2, and number 46,000 nationally.[308] Mr. Farrell ruled out the previous cleaner/housekeeping job because of the potential exposure to chemicals.[309]

The third hypothetical involved the same person from Hypothetical #2 but limited to occasional handling and fingering.[310] Mr. Farrell testified that the person would become unemployable.[311]

### 3.4    Administrative Findings

The ALJ followed the five-step sequential evaluation process to determine whether the plaintiff was disabled and concluded that she was not from February 5, 2014, the date the application was filed.[312]

At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since the application date of February 5, 2014.[313]

_____

[306] AR 81.

[307] AR 81–82.

[308] AR 82.

[309] *Id.*

[310] AR 82–83.

[311] AR 83.

[312] AR 19–20.

[313] AR 21.

At step two, the ALJ found "[t]he claimant has the following severe impairments: anxiety disorder, bipolar disorder, left De Quervain's syndrome of the wrist and status post breast cancer[.]"[314]

At step three, the ALJ found "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments[.]"[315] He wrote that the "[o]bjective evidence, clinical findings and treatment notes regarding the claimant's impairments do not support a finding that the severity of the claimant's impairments meet or equal a listing[.]"[316] The ALJ found that listings 12.04 and 12.06 were not met.[317] He considered the "paragraph B" criteria.[318] To satisfy these criteria

> [T]he mental impairment must result in at least one extreme or two marked limitations in a broad area of functioning, which are: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves. A marked limitation means functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited. An extreme limitation is the inability to function independently, appropriately or effectively, and on a sustained basis.[319]

The ALJ found:

> In understanding, remember, or applying information, the claimant has mild limitations. With regard to concentrating, persisting, or maintaining pace, the claimant has mild limitations. There is evidence of the claimant was [sic] a good historian at a psychological exam. The claimant was able to recall 3/3 words and correctly complete serial sevens. The claimant reported being independent in her activities of daily living, but with some restrictions due to physical health problems. The claimant said she is able to manage finances, read and listen to music. There is no evidence of more severe limits in these areas.
>
> In interacting with others, the claimant has moderate limitations. As for adapting or managing oneself. The claimant has experienced moderate limitations. The claimant reported that she is often fatigued and irritable. The claimant appeared cooperative,

---

[314] *Id.*

[315] *Id.*

[316] *Id.*

[317] AR 22.

[318] *Id.*

[319] *Id.*

but was tangential and difficult to redirect during a mental status exam. At times, she presented as grandiose. Her depression/anxiety symptoms were evident upon her mental health exam. There is insufficient evidence of marked limits in these areas[.][320]

As a result, the ALJ held the plaintiff's "mental impairments do not cause at least two 'marked' limitations or one 'extreme' limitation, [and] the 'paragraph B' criteria are not satisfied."[321]

The ALJ likewise held the "paragraph C" criteria of listings "12.04, depressive bipolar and related disorders, 12.15, schizophrenia spectrum and other psychotic disorders, or 12.06, anxiety and obsessive compulsive disorders" were not met.[322] He found that

[t]here is insufficient evidence to establish the presence of a medically documented history of these disorders over a period of at least 2 years, and evidence of both: (1) Medical treatment, mental health therapy, psychosocial support(s), and a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of the mental disorder [ ]; and (2) Marginal adjustment, that is, minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of the claimant's daily life [ ].[323]

Before step four the ALJ determined the plaintiff had the residual function capacity

to perform light work… except lift and carry 20 pounds occasionally and 10 pounds frequently; sit, stand or walk for 6 hours each out of an 8-hour workday; can push/pull as much as can lift/carry; handle items frequently with the left hand; finger frequently with the left hand; never climb ladders, ropes, or scaffolds; avoid concentrated exposure to hazards including heavy machinery, caustic chemicals and open heat sources; understand, remember and carryout simple, routine tasks; judgment limited to simple work-related decisions; respond appropriately to coworkers occasionally; respond appropriately to public only a brief, casual basis, but no more than 10% of the time.[324]

The ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence[.]"[325] The ALJ

---

[320] *Id.*

[321] *Id.*

[322] *Id.*

[323] *Id.*

[324] AR 23.

[325] *Id.*

followed a two-step process.[326] First, the ALJ determined that the plaintiff's medically determinable impairments could reasonably cause the alleged symptoms.[327] Second, the ALJ found that the intensity, persistence, and limiting effects of these symptoms, as alleged by the plaintiff, were not consistent with the medical evidence in the record.[328]

Regarding the plaintiff's mental impairments, the ALJ found the "objective evidence supports the diagnoses of bipolar disorder, and anxiety disorder (PTSD)."[329] He observed the plaintiff had never received inpatient treatment or been hospitalized for these conditions and had never been prescribed psychotropic medications.[330] He held that "[o]bjective clinical findings during the relevant period do not, overall, support any mental functioning limits other than those detailed in the residual functional capacity."[331] He said that the "post-hearing consultative examiner's report does not support a finding of disability" and provided an overview of the report.[332] The subsequent paragraphs summarized the reports of Dr. Kalich, Catherine Maggio, and the plaintiff's exam by Dr. Bledsoe in 2016.[333]

Following this overview, the ALJ found:

> [T]he claimant's conservative treatment history does not support any additional limits on her residual functional capacity. The claimant did not take psychotropic medication during the time at issue. There is evidence of a decrease in her PTSD symptoms after psychotherapy treatment. The treatment record as well as the claimant's ability to work part-time as a housekeeper and freelance filmmaker is consistent with the residual functional capacity in this decision. Although there are clinical findings that include irritability, mood swings, spasmodic dysphonia (with improvement) and nervousness, the record also reveals normal or unremarkable clinical findings. For instance there is evidence of normal mood and affect, normal appearance, pleasant, cooperative, unremarkable thought content, full activities of

---

[326] *Id.*

[327] AR 25.

[328] *Id.*

[329] *Id.*

[330] *Id.*

[331] *Id.*

[332] *Id.*

[333] AR 25–26.

daily living, no objective evidence of delusions or hallucinations, and good insight and judgment.[334]

He stated that the "opinion of Dr. Khoi as to [the plaintiff's] mental impairments is given great weight because of the opportunity to examine the claimant, and the opinion is supported by the totality of the medical evidence and it is supported by a detailed explanation."[335] The ALJ said that Dr. Khoi's opinion also contradicts that of Catherine Maggio.[336] Ms. Maggio's opinion was "overly reliant on the claimant's subjective statements" and "not consistent with the medical record as a whole."[337] Furthermore, the ALJ held that Ms. Maggio's opinion was given only partial weight because she was not an acceptable medical source.[338]

The ALJ gave little weight to the opinion of Dr. Kalich because "it is not consistent with the record [as] a whole and [was] internally inconsistent."[339] He stated, "Dr. Kalish noted marked limitation in concentration and stability but this was during a period the claimant was working at least part-time as a housekeeper and freelance filmmaker, which contradicts her assessment."[340] He also said there "is evidence that the claimant's psychotherapy (more than 10 years) and her active mental health treatment have helped her to overcome the effects of PTSD."[341]

The ALJ considered the administrative findings by the state-agency mental-impairment consultants and weighed them as statements from non-examining expert sources.[342] He stated that the opinions of Dr. Franco and Dr. Flocks that the "claimant's severe anxiety/depressive disorders resulted in moderate limitations in social functioning and in concentration, persistence or pace are

---

[334] AR 26.

[335] AR 27.

[336] AR 28.

[337] *Id.*

[338] *Id.*

[339] *Id.*

[340] *Id.*

[341] *Id.*

[342] AR 27.

given great weight as the opinions are supported by the medical record, by explanation and consistent with another opinion."[343]

Regarding the plaintiff's physical impairments, the ALJ found that "the medical records and objective evidence support the diagnoses of status post left breast cancer and left De Quervain's syndrome."[344] He then summarized the reports of Dr. Lewis and Dr. Bledsoe.[345] The ALJ held that "the opinion of examining consultative physician Dr. Lewis as to the claimant's physical limitations is afforded great weight as it is supported by explanation and by the relevant medical evidence."[346]

The ALJ afforded Dr. Godfrey's opinion little weight because the doctor gave no "indication for the stand/walk limitation other than mental fatigue" and "[t]he handling and fingering limitations are overstated and not supported by the claimant's own reported activities."[347] The ALJ found that "Dr. Godfrey relies on an assessment of mental limitations resulting from an impairment for which he has never treated the claimant nor examined."[348]

As to the state-agency medical physician, Dr. Herman, the ALJ weighed the opinion as a statement from a non-examining expert source.[349] Dr. Herman's opinion – that "the claimant could perform less than medium exertional level work" – was given only partial weight "as it is not consistent with the records as a whole as it understates the claimant's lift/carry limitation in light of her De Quervain's syndrome."[350]

---

[343] AR 27–28.

[344] AR 26.

[345] AR 26–27.

[346] AR 27.

[347] AR 28.

[348] *Id.*

[349] *Id.*

[350] *Id.*

The opinion of Mr. Soong, the plaintiff's roommate, was "given only some weight because the objective evidence does not fully support his statement concerning the claimant's inability to work."[351] The ALJ also found this to be an area reserved for the Commissioner.[352]

Thus, the ALJ found that "[i]n sum, there are limitations, such as those that the undersigned has found, but the claimant is still able to work despite them."[353]

At step four, the ALJ found that the plaintiff was unable to perform any past relevant work because her past job as a house cleaner was assigned a medium exertional level with a rating of SVP-3.[354]

At step five, the ALJ determined that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform."[355] The ALJ stated he was required to consider the "claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines[.]"[356] He observed that "[i]f the claimant had the residual functional capacity to perform the full range of light work, a finding of 'not disabled' would be directed[.]"[357] The ALJ, however, found that the "claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations."[358] Given these additional limitations, the ALJ asked the vocational expert what jobs were available and the expert testified that some of the jobs that could be performed were final inspector, lead former, and marker.[359]

---

[351] AR 29.

[352] Id.

[353] Id.

[354] Id.

[355] Id.

[356] Id.

[357] Id.

[358] AR 30.

[359] Id.

Based on this information, the ALJ concluded that, "considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy [and] [a] finding of 'not disabled' is therefore appropriate under the framework of the above-cited rule."[360] Thus, the ALJ's final ruling was that "[b]ased on the application for supplemental security income protectively filed on February 5, 2014, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act."[361]

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the claimant initiates a suit within sixty days of the decision. A court may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal citation and quotation marks omitted); 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). The reviewing court should uphold "such inferences and conclusions as the [Commissioner] may reasonably draw from the evidence." *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965). If the evidence in the administrative record supports the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *Tackett v. Apfel*, 180 F.3d 1094, 1097– 98 (9th Cir. 1999). "Finally, [a court] may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

---

[360] *Id.*

[361] *Id.*

# GOVERNING LAW

A claimant is considered disabled if (1) he or she suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that he [or she] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 1382c(a)(3)(A) & (B). The five-step analysis for determining whether a claimant is disabled within the meaning of the Social Security Act is as follows. *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

**Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).

**Step Two**. Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

**Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

**Step Four.** Considering the claimant's RFC, is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).

**Step Five.** Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.

For steps one through four, the burden of proof is on the claimant. *Gonzales v. Sec'y of Health & Human Servs.*, 784 F.2d 1417, 1419 (9th Cir. 1986). At step five, the burden shifts to the Commissioner. *Id.*

## ANALYSIS

The plaintiff contends that the ALJ erred by (1) improperly weighing the medical evidence, (2) improperly weighing non-medical evidence, (3) finding that the plaintiff did not meet the B criteria of any mental-health listing without substantial evidence, and (4) providing a residual-function-capacity assessment that was not supported by substantial evidence.[362] The plaintiff seeks remand with instructions to award benefits, or alternatively, remand for further administrative hearings.[363] The court grants the plaintiff's motion for summary judgment and remands the case for further proceedings.

### 1. Whether the ALJ Erred by Discounting Medical-Opinion Evidence

The plaintiff contends that the ALJ failed to properly weigh the medical opinions in the record.[364] Because the ALJ did not provide specific and legitimate reasons for discounting or affording little weight to the opinions of Dr. Godfrey and Dr. Kalich, the court remands for reconsideration of this medical evidence.

#### 1.1 Legal Standard

The ALJ is responsible for "'resolving conflicts in medical testimony, and for resolving ambiguities.'" *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) (quoting *Andrews*, 53 F.3d at 1039). In weighing and evaluating the evidence, the ALJ must consider the entire case record, including each medical opinion in the record, together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *see also Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) ("[A] reviewing

---

[362] Mot. – ECF No. 17 at 3–4.

[363] *Id*. at 24.

[364] *Id*. at 9–15.

court [also] must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (internal quotation marks and citation omitted).

"In conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527). Social Security regulations distinguish between three types of physicians: (1) treating physicians; (2) examining physicians; and (3) non-examining physicians. 20 C.F.R. § 416.927(c), (e); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing [non-examining] physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing *Lester*, 81 F.3d at 830); *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996).

An ALJ may disregard the opinion of a treating physician, whether or not controverted. *Andrews*, 53 F.3d at 1041. "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan*, 528 F.3d at 1198 (alteration in original) (internal quotation marks and citation omitted). By contrast, if the ALJ finds that the opinion of a treating physician is contradicted, a reviewing court will require only that the ALJ provide "specific and legitimate reasons supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (internal quotation marks and citation omitted); *see also Garrison*, 759 F.3d at 1012 ("If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.") (internal quotation marks and citation omitted). "The opinions of non-treating or non-examining physicians may serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).

An ALJ errs when he "rejects a medical opinion or assigns it little weight" without explanation or without explaining why "another medical opinion is more persuasive, or criticiz[es] it with boilerplate language that fails to offer a substantive basis for his conclusion." *Garrison*, 759 F.3d

at 1012–13. "[F]actors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided[,] the consistency of the medical opinion with the record as a whole [, and] the specialty of the physician providing the opinion . . . ." *Orn*, 495 F.3d at 631. (citing 20 C.F.R. § 404.1527(d)(3)–(6)); *see also Magallanes v. Bowen*, 881 F.2d 747, 753 (9th Cir. 1989) (an ALJ need not agree with everything contained in the medical opinion and can consider some portions less significant than others).

### 1.2    Application

#### 1.2.1    Dr. Godfrey

Dr. Godfrey's opinions are contradicted by the opinions of the state-agency non-examining physician and the post-hearing consultant. Thus, the ALJ was required to give specific and legitimate reasons for discounting them. *Reddick*, 157 F.3d at 725. The ALJ gave little weight to Dr. Godfrey's opinion regarding the plaintiff's physical limitations for the following reasons:

> Dr. Godfrey gave no indication for the stand/walk limitation other than mental fatigue. The handling and fingering limitations are overstated and not supported by the claimant's own reported activities. Further, Dr. Godfrey relies on an assessment of mental limitations resulting from an impairment for which he has never treated the claimant nor examined.[365]

The ALJ erred by discounting Dr. Godfrey's opinion. "A treating physician's opinion is not binding on the Commissioner with respect to the existence of an impairment or the ultimate issue of disability." *Alvala v. Colvin*, SACV 12–0626 AJWW, 2013 WL 1620352, at *5 (C.D. Cal., Apr. 15, 2013) (citing *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001). "However, a treating physician's medical opinion as to the nature and severity of an individual's impairment is entitled to controlling weight when that opinion is well-supported and not inconsistent with other substantial evidence in the record." *Id.* (citing *Edlund v. Massanari*, 253 F.3d 1152, 1157 (9th Cir. 2001); *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001)). "Even when not entitled to controlling weight, 'treating source medical opinions are still entitled to deference and must be weighed' in light of (1) the length of the treatment relationship; (2) the frequency of examination;

---

[365] AR 28.

(3) the nature and extent of the treatment relationship; (4) the supportability of the diagnosis; (5) consistency with other evidence in the record; and (6) the area of specialization. *Id.* (quoting *Edlund*, 253 F.3d at 1157 & n.6).

Dr. Godfrey treated the plaintiff for over two and a half years after she was diagnosed with breast cancer.[366] Dr. Godfrey's medical-opinion evidence also reflects and is consistent with the reports of Dr. Lewis and Dr. Bledsoe. Dr. Godfrey listed diagnoses related to the plaintiff's hand and wrist issues and mental condition, and he prescribed treatment for each.[367] He stated that the primary reasons for not being able to work were her joint pain and mental condition.[368] The plaintiff's wrist and hand issues are supported by the report of Dr. Lewis.[369] Dr. Kalich, Dr. Bledsoe, and Ms. Maggio, who each treated or examined the plaintiff, submitted reports that are consistent with Dr. Godfrey's diagnoses.[370]

Dr. Lewis noted that the plaintiff could not pick up a paperclip with her left hand and used a splint on her left wrist at all times.[371] She had reduced grip strength of three and a half out of five on the left hand.[372] Dr. Lewis diagnosed the plaintiff with De Quervain's syndrome of the wrist and recommended her workplace activities be limited because of the plaintiff's decreased grip, fine finger movement, De Quervain's syndrome, wrist splint, and decreased motion in her wrist.[373] Dr. Bledsoe found that the plaintiff's leg issues were likely related to a functional-movement disorder that was "temporally related to significant emotional stress."[374] This illustrates the connection between the plaintiff's physical symptoms and her mental health.

---

[366] AR 450.

[367] *Id.*

[368] AR 453.

[369] AR 460–463.

[370] AR 458–459, 587–590, 597.

[371] AR 461–62.

[372] AR 463.

[373] AR 464.

[374] AR 597.

United States District Court
Northern District of California

Dr. Godfrey's opinion is likewise consistent with the plaintiff's and her roommate's testimony. The ALJ found the claimant's activities did not support the handling and fingering limitations reported, but this is not accurate, and the ALJ does not provide specific analysis as to which of the claimant's activities did not accord with these limitations. The claimant testified to experiencing numbness and stiffness in her fingers and reported having to stop working because of her hand and wrist impairments.[375] She had to stop writing in her journal and could type only for short periods.[376] Mr. Soong testified that the plaintiff's impairment meant he had to help her with basic chores, preparing food, shopping, and opening cans and jars for her.[377] Her ability to dress, bathe, care for her hair, feed herself, use the toilet, and use skin care products was also negatively affected.[378] The plaintiff responded to the ALJ's question about whether she could do a job putting things in a box by stating her hands would prevent her from doing so and expressing concern that such a job also could lead to the further breakdown of her hands that could inhibit her ability to go to the bathroom by herself or put herself to bed.[379]

The ALJ did not provide the specific and legitimate reasons supported by substantial evidence necessary to discount Dr. Godfrey's medical opinion.

### 1.2.2 Dr. Kalich

The ALJ gave Dr. Kalich's opinion "little weight" because it was "not consistent with the record [as] a whole and [is] internally inconsistent."[380] He continued,

> Dr. Kali[c]h noted marked limitation in concentration and stability but this was during a period the claimant was working at least part-time as a housekeeper and freelance filmmaker, which contradicts her assessment. There is evidence that the claimant's psychotherapy (more than 10 years) and her active mental health treatment have helped her to overcome the effects of PTSD.[381]

---

[375] AR 24, 42.

[376] AR 60.

[377] AR 68, 285, 287.

[378] AR 286.

[379] AR 76–77.

[380] AR 28.

[381] *Id.*

"Occasional symptom free periods – and even the sporadic ability to work – are not inconsistent with disability." *Lester*, 81 F.3d at 833. "Generally, an ALJ should not consider activities like taking care of oneself, household tasks, hobbies, school attendance, club activities, or social programs to be substantial gainful activities." *Lewis v. Apfel*, 236 F.3d 503, 516 (9th Cir. 2001). "[D]aily activities may be grounds for an adverse credibility finding 'if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting." *Orn*, 495 F.3d at 639 (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

The ALJ does not provide more specific details as to why working part-time as a housekeeper or freelance filmmaker is inconsistent with Dr. Kalich's report indicating the plaintiff has a marked limitation in concentration and stability. Furthermore, while Dr. Kalich reported "there [was] insufficient evidence to indicate the presence of Posttraumatic Stress Disorder (PTSD)[,]" she also diagnosed the plaintiff with "Unspecified Bipolar and Related Disorder," which was not analyzed by the ALJ.[382] Again, because the ALJ did not specifically analyze how the plaintiff's activities were inconsistent with the reported limitations, the court remands for reconsideration of this medical-opinion evidence.

## 2. Whether the ALJ Erred by Discounting Non-Medical Opinion Evidence

The plaintiff contends that the ALJ failed to properly weigh the opinion of Catherine Maggio, MFT.[383] The court finds that the ALJ did not provide sufficient reasons for assigning little weight to Ms. Maggio's opinion and remands for reconsideration.

### 2.1 Legal Standard

In addition to the medical opinions of the "acceptable medical sources" outlined above, the ALJ must consider the opinions of other "medical sources who are not acceptable medical sources and [the testimony] from nonmedical sources." 20 C.F.R. § 404.1527(f). The ALJ is required to

---

[382] AR 28, 458–59.

[383] Mot. – ECF No. 17 at 17.

consider observations by "other sources" as to how an impairment affects a claimant's ability to

work. *Id.* Nonetheless, an "ALJ may discount the testimony" or an opinion "from these other

sources if the ALJ gives . . . germane [reasons] for doing so." *Molina*, 674 F.3d at 1111 (internal

quotations and citations omitted). "[A]n opinion from a medical source who is not an acceptable

medical source. . . may outweigh the medical opinion of an acceptable medical source[.]" 20

C.F.R. § 404.1527(f)(1). "For example, it may be appropriate to give more weight to the opinion

of a medical source who is not an acceptable medical source if he or she has seen the individual

more often than the treating source, has provided better supporting evidence and a better

explanation for the opinion, and the opinion is more consistent with the evidence as a whole." *Id.*

    The ALJ must consider "other source" testimony and evidence from a layperson. *Ghanim v.

Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014); *Molina*, 674 F.3d at 1111; *Bruce v. Astrue*, 557 F.3d

1113, 1115 (9th Cir. 2009) ("In determining whether a claimant is disabled, an ALJ must consider

lay witness testimony concerning a claimant's ability to work.") (internal quotation marks and

citation omitted). "Descriptions by friends and family members in a position to observe a

claimant's symptoms and daily activities have routinely been treated as competent evidence."

*Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987). It is competent evidence and "cannot be

disregarded without comment." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996).

Moreover, if an ALJ decides to disregard the testimony of a lay witness, the ALJ must provide

"specific" reasons that are "germane to that witness." *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir.

2007) (internal citations omitted). The Ninth Circuit has not "required the ALJ to discuss every

witness's testimony on an individualized, witness-by-witness basis." *Molina*, 674 F.3d at 1114. An

ALJ may "point to" reasons already stated with respect to the testimony of one witness to reject

similar testimony by a second witness. *Id.*

### 2.2 Application

    As an MFT, Ms. Maggio qualifies as a "non-acceptable" medical source. As such, the ALJ

was required to give "germane" reasons for discounting her testimony. The ALJ's stated reason

for giving little weight to Ms. Maggio's opinion was that "her opinion appears to be overly reliant

on the claimant's subjective statements and her opinion is not consistent with the medical record as a whole. Her opinion also is contradicted by psychologist Dr. Khoi."[384]

First, in the Ninth Circuit, "[c]ontradictory medical evidence is not a germane reason to reject lay witness testimony." *Burns v. Berryhill*, 731 Fed. App'x 609, 613 (9th Cir. 2018) (citing *Diedrich v. Berryhill*, 874 F.3d 634, 640 (9th Cir. 2017)).

Second, Ms. Maggio's opinion should be given additional weight based on her history with the plaintiff. As discussed above, a non-acceptable medical source's opinion can outweigh that of an acceptable medical source where the non-acceptable medical source has seen an individual more than once. *See* 20 C.F.R. § 404.1527(f)(1). Here, Ms. Maggio held regular weekly sessions with the plaintiff from November 2002 to December 2015.[385] She has significantly more experience with the plaintiff than any other medical source in the record. She provided detailed observations of the plaintiff's medical and mental history and the impacts of various increasing stressors that have negatively impacted the plaintiff's ability to work.[386]

Ms. Maggio reported an assortment of symptoms exhibited by the plaintiff: she was severely limited in her ability to maintain attention for two-hour segments; she was unable to meet competitive standards to maintain regular attendance and be punctual within customary tolerances, accept instructions, respond appropriately to criticism, or interact appropriately with the general public; she had no useful ability to function in coordination or in proximity to others without being distracted; she could not complete a normal workday and workweek without interruptions from her symptoms; she could not perform at a consistent pace without an unreasonable number of breaks; she could not appropriately get along with co-workers or maintain socially appropriate behavior; and she had no useful ability to deal with the stress of work.[387]

---

[384] AR 28.

[385] AR 585.

[386] AR 572–574.

[387] AR 587–588.

Furthermore, Ms. Maggio said that the plaintiff had "marked" difficulty in maintaining concentration, persistence or pace, and "extreme" difficulties in maintaining social functioning and restrictions of activities of daily living.[388]

Ms. Maggio's observations and opinion were also consistent with the medical record as a whole. Dr. Godfrey found that the plaintiff's mental condition was a substantial limitation on her ability to work.[389] Dr. Kalich observed "signs of mania/hypomania, including rapid, tangential speech, psychomotor agitation, a flight of ideas . . . [and] subtle paranoia."[390] She also reported the plaintiff had marked impairments in concentration and social functioning, which "would create significant instability in the workplace and [would] likely [ ] impede her ability to form and maintain positive work relationships."[391] Dr. Khoi, the post-hearing evaluator, also found the plaintiff to be very tangential and difficult to redirect.[392]

Lastly, regarding the plaintiff's mental impairments, the ALJ supported his conclusion that "[o]bjective clinical findings during the relevant period do not, overall, support any mental functioning limits other than those detailed in the residual function capacity[,]" in part, by stating that "the claimant never received inpatient treatment or psychiatric hospitalization."[393] Moreover, he said, "[c]oncerning her mental impairments, the claimant's conservative treatment history does not support any additional limits on her residual functional capacity."[394] Following these statements, he noted that the plaintiff had not been prescribed any psychotropic medications.[395] The Ninth Circuit has stated, "we have particularly criticized the use of a lack of treatment to reject mental complaints both because mental illness is notoriously underreported and because 'it is a questionable practice to chastise one with a mental impairment for the exercise of poor

---

[388] AR 589.

[389] AR 453.

[390] AR 456.

[391] AR 459.

[392] AR 599.

[393] AR 25.

[394] AR 25.

[395] AR 25–26.

judgment in seeking rehabilitation.'" *Regennitter v. Comm'r Soc. Sec. Admin.*, 166 F.3d 1294, 1299–1300 (9th Cir. 1999) (quoting *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996)). In addition, the record indicated that the plaintiff did receive treatment from her therapist, Ms. Maggio, from 2002 to 2015.

Given the generality of the reasons proffered by the ALJ, the court cannot properly assess whether they are germane and thus remands for reconsideration of this issue.

### 3. Whether the ALJ Erred by Finding the Plaintiff's Condition Did Not Meet or Equal a Listing

At step three, the ALJ evaluated the plaintiff under two listed impairments: 12.04 (Depressive, bipolar and related disorders) and 12.06 (Anxiety and obsessive-compulsive disorders). 20 C.F.R. pt. 4, subpt. P, app'x 1.

#### 3.1    Legal Standard

To meet the paragraph B criteria for listings 12.04 and 12.06, a claimant must demonstrate an "[e]xtreme limitation of one, or marked limitation of two, of the following areas of mental functioning: (1) Understand, remember, or apply information; (2) Interact with others; (3) Concentrate, persist, or maintain pace; (4) Adapt or manage oneself." *Id*. In order to meet the C criteria for listings 12.04 and 12.06, a claimant must have a "mental disorder . . . [that] is 'serious and persistent' . . ." and that there must be "evidence of both (1) Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder; and (2) Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life." *Id*.

The claimant bears the burden of proving that an impairment or combination of impairments meets or equals the criteria of a listing. *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). "An ALJ must evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment. *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001). Generally, a "boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not

meet or equal a listing" unless the ALJ's discussion of the relevant medical evidence adequately supports the conclusion. *Id.* at 512–13*; see also, e.g., Marcia v. Sullivan,* 900 F.2d 172, 176 (9th Cir. 1990) (noting that ALJ's unexplained finding at step three was a reversible error).

### 3.2 Application

Here, the ALJ concluded that the plaintiff's impairments did not meet the paragraph B criteria for either listing because her mental impairments did not cause at least two "marked" limitations or one "extreme" limitation.[396] He found:

> In understanding, remembering, or applying information, the claimant has mild limitations. With regard to concentrating, persisting, or maintaining pace, the claimant has mild limitations. There is evidence [that] the claimant was a good historian at a psychological exam. The claimant was able to recall 3/3 words and correctly complete serial sevens. The claimant reported being independent in her activities of daily living, but with some restrictions due to physical health problems. The claimant said she is able to manage finances, read and listen to music. There is no evidence of more severe limits in these areas.

> In interacting with others, the claimant has moderate limitations. As for adapting or managing oneself, the claimant has experienced moderate limitations. The claimant reported that she is often fatigued and irritable. The claimant appeared cooperative, but was tangential and difficult to redirect during a mental status exam. At times, she presented as grandiose. Her depression/anxiety symptoms were evident upon her mental health exam. There is insufficient evidence of marked limits in these areas.[397]

In addition, the ALJ determined the plaintiff did not meet the C criteria for either listing because there was

> insufficient evidence to establish the presence of a medically documented history of these disorders over a period of at least 2 years, and evidence of both:

> 1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of the mental disorder [ ]; and

> 2. Marginal adjustment, that is, minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of the claimant's daily life [ ].[398]

---

[396] AR 22.

[397] *Id.*

[398] *Id.*

While the ALJ provided evidence that he relied on for his paragraph B determination, he did not provide more than conclusory remarks concerning the paragraph C criteria. Without more information, the court cannot find there was sufficient evidence underlying the ALJ's determination that the plaintiff's impairments did or did not meet the paragraph C criteria for listing 12.04 and/or 12.06. Additionally, the court found above that the ALJ did not adequately provide reasons for discounting medical and non-medical testimony. Therefore, the court remands for reconsideration of this issue.

### 4. Whether the ALJ Erred by Assessing the Plaintiff's Residual Function Capacity

The ALJ found that the plaintiff had an RFC that allowed her to:

> [P]erform light work… except lift and carry 20 pounds occasionally and 10 pounds frequently; sit, stand or walk for 6 hours each out of an 8-hour workday; can push/pull as much as can lift/carry; handle items frequently with the left hand; finger frequently with the left hand; never climb ladders, ropes, or scaffolds; avoid concentrated exposure to hazards including heavy machinery, caustic chemicals and open heat sources; understand, remember and carryout simple, routine tasks; judgment limited to simple work-related decisions; respond appropriately to coworkers occasionally; respond appropriately to public only a brief, casual basis, but no more than 10% of the time.[399]

As discussed above, the ALJ did not provide adequate reasons for discounting certain medical testimony. Because the court remands for a reweighing of medical-opinion evidence, and the RFC assessment is built on the ALJ's assessment at the prior steps in the sequential-evaluation process, the court remands here too.

### CONCLUSION

The court grants the plaintiff's motion for summary judgment, denies the Commissioner's cross-motion, and remands the case for further proceedings consistent with this order.

**IT IS SO ORDERED.**

Dated: July 12, 2019

_____
LAUREL BEELER
United States Magistrate Judge

---

[399] AR 23.

United States District Court
Northern District of California